**Clifton WELLS, Plaintiff,**

**v.**

**Thomas ISRAEL, Gerald Herringa, Jerome Elliott and Daniel Buchler, Defendants.**

No. 81-C-133.

United States District Court, E.D. Wisconsin.

Feb. 26, 1986.

As Amended March 4, 1986.

500

Gregory C. Bruce, Charne, Glassner, Tehan, Clancy & Taitelman, S.C., Milwaukee, Wis., for plaintiff.

Daniel O'Brien, Asst. Atty. Gen., Dept. of Justice, Madison, Wis., for defendants.

## DECISION AND ORDER

WARREN, District Judge.

Plaintiff commenced this action on February 12, 1981, pursuant to 42 U.S.C. § 1983 seeking declaratory, injunctive and monetary relief for the alleged deprivation of his constitutional rights stemming from his segregated status as an inmate at Waupun Correctional Institution. On June 23, 1982, plaintiff moved this Court for a temporary restraining order and a preliminary injunction to enjoin the defendants from placing him in any form of involuntary segregated confinement while this action was pending. This motion was mooted by plaintiff's return to the general prison population prior to an adjudication on the merits. Subsequently, the parties agreed that this case could be most expeditiously disposed of via cross motions for summary judgment on the issue of defendants' liability under 42 U.S.C. § 1983 and, if necessary, a trial to determine the appropriate relief. Pursuant to this format, the parties have submitted cross motions for summary judgment which the Court now proceeds to resolve.

## BACKGROUND

Plaintiff was convicted of First Degree Murder and Armed Robbery in 1969 and has since been incarcerated in the Wisconsin State Prison system. The present matter concerns four periods of punitive segregation imposed on the plaintiff and one continuous period of non-punitive administrative segregation. Specifically, on four occasions between September of 1977 and April of 1981, the plaintiff was removed from Waupun's general prison population and placed in program segregation in part for punitive reasons. *See* Wis.Admin.Code § HSS 303.70. These placements resulted from prison disciplinary committee findings that the plaintiff violated various prison rules. Further, from April of 1981 through November 4, 1983, plaintiff was kept in administrative confinement at Waupun. "Administrative confinement" is defined as "an involuntary nonpunitive status for the segregated confinement of an inmate solely because he or she is dangerous, to ensure personal safety and security within the institution." Wis.Admin.Code § HSS 308.-04(1).

Inmate complaints concerning plaintiff's threats and demands for sexual favors initiated the disciplinary process resulting in the four periods of punitive segregation. Following receipt of these complaints a prison security staff member investigated the matter and, in each instance, he prepared a conduct report alleging that plaintiff had violated prison rules. The prison's disciplinary committee conducted hearings regarding these allegations on September 27, 1977, January 18, 1978, and April 17, 1980—the plaintiff waived his right to a hearing as to the fourth incident on October 20, 1978.

The plaintiff claims that the disciplinary committee's procedures used in each of these four instances violated his due process rights. Specifically, the plaintiff challenges the disciplinary committee's use of confidential informants' reports in each instance, the inadequate notice of alleged misconduct issued to the plaintiff and the disciplinary committee's deficient state-

ment of evidence relied upon in finding him guilty of misconduct.

The plaintiff's extended confinement in administrative segregation began after an April 30, 1981 hearing where the Waupun Program Review Committee (PRC) found plaintiff to be "dangerous." Thereafter, the PRC conducted periodic reviews of plaintiff's status at approximately ninety-day intervals until his release into the general prison population on November 4, 1983. Plaintiff claims that the procedure used in both his initial placement in administrative segregation and his continued confinement therein, violated his due process rights. Specifically, the plaintiff alleges that the PRC failed to follow the applicable regulations in determining that he was dangerous and that the PRC's factfinding process was generally inadequate.

Defendants are various correctional personnel who worked at Waupun during the times pertinent to plaintiff's allegations. In defense, and as a basis for moving for summary judgment, defendants assert that plaintiff was afforded his due process rights as a prisoner and, alternatively, if plaintiff was deprived of his constitutional rights each defendant is entitled to qualified immunity.

## DISCUSSION

### I. Plaintiff's Punitive Segregation.

■ In *Hewitt v. Helms*, 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1982), the United States Supreme Court discussed generally inmates' constitutional rights:

> We have repeatedly said both that prison officials have broad administrative and discretionary authority over the institutions they manage and that lawfully incarcerated persons retain only a narrow range of protected liberty interests. As to the first point, we have recognized that broad discretionary authority is necessary because the administration of a prison is "at best an extraordinarily difficult undertaking," *Wolff v. McDonnell*, 418 U.S. at 566, [94 S.Ct. at 2980], and have concluded that "to hold ... that any

> substantial deprivation imposed by prison authorities triggers the procedural protections of the Due Process Clause would subject to judicial review a wide spectrum of discretionary actions that traditionally have been the business of prison administrators rather than of the federal courts." *Meachum v. Fano*, 427 U.S. [215] at 225 [96 S.Ct. 2532, 2538, 49 L.Ed.2d 451 (1976)]. As to the second point, our decisions have consistently refused to recognize more than the most basic liberty interests in prisoners. "Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Price v. Johnston*, 334 U.S. 266, 285 [68 S.Ct. 1049, 1060, 92 L.Ed. 1356] (1948).

*Id.* at 467, 103 S.Ct. at 869. However, where, as here, a State enacts regulatory measures concerning the segregation of prisoners, Wis.Admin.Code § HSS 303.76, *et seq.*, a liberty interest protected by the Due Process Clause is created. 459 U.S. at 469, 103 S.Ct. at 870.

In the instant action regarding the four instances of plaintiff's punitive segregation, plaintiff claims due process deprivations in the following two respects: (1) inadequate notice of alleged misconduct, and (2) the disciplinary committee's deficient statements of evidence relied upon in finding the plaintiff guilty of misconduct on the four occasions.

### A. Adequacy of the Notice.

■ "[W]ritten notice of the charges must be given to the disciplinary-action defendant in order to inform him of the charges and to enable him to marshall the facts and prepare a defense." *Wolff v. McDonnell*, 418 U.S. 539, 564, 94 S.Ct. 2963, 2979, 41 L.Ed.2d 935 (1973). Further, Wis. Admin.Code § HSS 303.76 outlines the notice requirement for an inmate alleged to have committed a major violation.

On each of the four occasions that plaintiff was accused of committing a major violation, prior to a hearing he received a

"Notice of Alleged Misconduct" accompanied by the applicable "Conduct Report" elaborating on the charges. The Notice of Alleged Misconduct appears to be a form document containing the provisions required by Wis.Admin.Code § HSS 303.76. Specifically, the notice informs the accused of the following: that a copy of the conduct report is attached; that the accused is being assigned to the adjustment center pending disposition; the penalties if found guilty of the alleged misconduct; the accused's right to waive a formal hearing and the resulting procedure if such a waiver is made; and the accused's rights if he demands a formal hearing, including the right to have a staff advocate's assistance, the right to present material eyewitnesses to testify on his behalf, the right to cross-examine the complainant, and the right to appeal the committee's decision to the Warden. The plaintiff received essentially this same form Notice of Alleged Misconduct initiating the four disciplinary proceedings resulting in his confinement in punitive segregation.

The contents of the conduct reports attached to the Notices of Alleged Misconduct detail the underlying charges with differing levels of specificity. The conduct reports dated September 9, 1977, and January 13, 1978, contain similar statements in the "Description of Incident" section. These statements allege that resident informants made numerous complaints accusing plaintiff of threatening bodily harm if they did not submit to illicit sexual activities. The identities of the informants were stated to be confidential. Further, these descriptions of the incidents conclude that the plaintiff's conduct jeopardizes the safety and security of many residents and is a constant annoyance to other residents.

The "Description of Incident" section in the March 20, 1980 conduct report states:

The above named inmate is being placed on report for striking another inmate and strong arming inmates for Homosexual favors.

This report was written on April 8, 1980 after an investigation was completed on this incident.

CONFIDENTIAL statements will be made available to the DUE PROCESS COMMITTEE to substaniate [sic] these allegations.

The final conduct report at issue in this case, dated July 23, 1980, alleges that three letters were sent by the plaintiff to other residents containing homosexual solicitations. The letters were attached to the conduct report.

Plaintiff argues that these notices "failed to state any details as to the time or place or specific nature of the alleged misconduct." *Plaintiff's Brief in Support of His Motion for Summary Judgment* at 5. The crux of plaintiff's position is that the defendants improperly withheld details in the notice based on the assertion of confidentiality. Defendants respond that the need for confidentiality justifies failing to articulate all of the details in the conduct reports.

In *McCollum v. Miller*, 695 F.2d 1044 (7th Cir.1982), the Seventh Circuit Court of Appeals discussed the due process ramifications of a generalized notice of charges in the context of a disciplinary action taken against an inmate for alleged misconduct. The panel stated:

On the merits of this appeal, then, the only issue is whether Ramirez-Rodriguez received due process of law. To decide this we must weigh the costs of additional procedural safeguards against the benefits, in reduced errors, which those safeguards would yield, bearing in mind that the benefits are a function both of the probability of error in the absence of a given safeguard and the cost of that error to the person claiming the safeguard. [citations omitted].

Ramirez-Rodriguez argues that he should have received both a more detailed notice of the charges against him and more safeguards against erroneous findings at the hearing. The notice he received was so general that it was difficult for him to prepare any defense. But

unfortunately the costs of additional notice would have been great. The essential information that Ramirez-Rodriguez needed to prepare his defense was the time and place of each alleged act of extortion. Any information falling short of this would have added nothing of value to the uninformative statement of charges which he did receive. But the additional information would have tipped him off to the names of all or most of the informants, whether the informants were the alleged victims of extortion, or witnesses to the alleged acts of extortion, or some of each. Such a tip-off could be lethal.

* * * * * *

These costs outweigh in our judgment the benefits, substantial as they would be, of giving inmates accused of serious offenses the information they need to prepare an effective defense.

*Id.* at 1048. Essentially, this Court is required to conduct a balancing test weighing the benefits to plaintiff if provided with the confidential information against the costs to Waupun if such information were provided. These costs concern the decreased security because of the likelihood that inmates will be chilled from reporting future instances of misconduct by their fellow inmates.

■ In conducting the balancing test, the Court finds that the scale tips in favor of withholding the confidential information. This decision is based on an examination of the items included in the record before the Court. These items include the informants' complaints forming the basis for the September 9, 1977, and January 13, 1978 conduct reports; plaintiff's letters soliciting homosexual favors from fellow inmates and threatening physical recourse if such solicitations were rebuffed, which inspired the July 23, 1980 conduct report; the actual conduct reports initiating the four disciplinary actions; and the prison records displaying the plaintiff's turbulent institutional history. The Court finds that there existed a real and substantial threat that plaintiff would retaliate against his fellow inmates whose complaints led to his segregation. Further, the notices received by plaintiff sufficiently apprised him of the procedural aspects of the disciplinary proceeding and informed him of the nature of the charges. Under these circumstances, the notices received by plaintiff were constitutionally sufficient.

**B. Adequacy of the Findings.**

■ Due process requires that in imposing punitive segregation "there must be a 'written statement by the factfinders as to the evidence relied on and reasons' for the disciplinary action." *Wolff, supra* 418 U.S. at 564, 94 S.Ct. at 2979. In rendering a decision to segregate a prisoner, the factfinders may rely on "purely subjective evaluations and on predictions of future behavior." *Mims v. Shapp,* 744 F.2d 946, 951 (3d Cir.1984). Further, reliance on confidential items is appropriate unless no reasonable adjudicator could have found a violation of prison rules based on such items. *Hudson v. Cady,* 610 F.Supp. 1096, 1098 (E.D.Wis.1985). The concern regarding the sufficiency of the factfinders' written statement stems from the need to protect a prisoner from collateral consequences of a disciplinary action and to encourage fair decision making. *Wolff, supra* 418 U.S. at 564, 103 S.Ct. at 2978. Accordingly, a due process violation occurs where the factfinders articulate the reasons for segregating a prisoner by merely adopting the investigator's report and the conduct report. *Hayes v. Walker,* 555 F.2d 625 (7th Cir.1977). Likewise, simple conclusory statements, *i.e.* "for all of the evidence", are insufficient. *Redding v. Fairman,* 717 F.2d 1105, 1115 (7th Cir.1983). Rather, a statement establishing the evidence underlying the decision is required; that is, statements such as "the guard saw him", "upon the prisoner's own admissions" or "the prisoner is lying" are sufficient. *Id.* at 1116.

In the present case, the plaintiff does not challenge the substantive aspect of the disciplinary committees' findings of his misconduct. Rather, plaintiff charges that the committee's written findings in each of the

four instances were constitutionally deficient in failing to state the evidence relied upon in rendering its decisions. Further, plaintiff asserts that the disciplinary committee failed to sufficiently articulate its evaluations of the confidential information relied upon in rendering their determinations.

The pre-printed forms used by the disciplinary committee contained a section requesting a "narrative decision on issue of guilt and reasons for decision." In response to this request: the committee of September 27, 1977, wrote "Committee finds resident guilty of all charges"; the committee of January 18, 1978, wrote "Guilty of all charges. Confidential material substantiates"; the committee of April 17, 1980, wrote "Guilty of both charges based on confidential information in report and at hearing, and confidential information supplied to committee"; and the committee of August 5, 1980, wrote "We accept the uncontested report as written after having read the 3 letters."

Regarding the allegations that the disciplinary committee failed to evaluate the confidential informants, there was no section concerning this subject on the pre-printed "Worksheet For Disciplinary Hearing Record." The only section remotely applicable was entitled "List each witness and evaluate the credibility of his testimony." This section contained a space blank where the witness' name was to be inserted followed by the question "Credible? Yes _____ No _____", to be marked accordingly. The committee's evaluation of September 27, 1980, listed four unnamed confidential informants with the corresponding credibility determination marked "yes." The other three evaluations signaled the inapplicability of this section ostensibly because no witnesses were called at the hearings.

The Court first notes that the disciplinary committee need only state the evidence relied upon in making its decision. This requirement is satisfied by tersely identifying a particular witness who testified at the hearing or a document used as evidence in establishing the misconduct.

The committee's evaluations of January 18, 1978, April 17, 1980, and August 5, 1980, met this requirement by identifying "confidential material"; "confidential information in report and at hearing, and confidential information supplied to committee"; and "the uncontested report as written after having read the 3 letters", respectively, as the evidentiary items relied upon. Such statements meet the *Redding* requirements by establishing the evidence underlying the decision, thereby protecting the plaintiff from a mischaracterization of the disciplinary action upon review. 717 F.2d at 1116. However, the committee's evaluation of September 27, 1977, by merely stating "Guilty of all charges" does not meet the *Redding* requirements. Accordingly, the Court finds that only the disciplinary committee's statement of evidence relied upon in the September 27, 1977 evaluation violated plaintiff's due process rights.

Regarding plaintiff's allegations of constitutional deprivations resulting from the committee's failure to expressly evaluate the credibility of the confidential information, the Court is persuaded by the holding in *Hudson v. Cady*, 610 F.Supp. 1096 (E.D.Wis.1985). In *Hudson*, Judge Reynolds resolved the issue of whether the disciplinary committee was required to explicitly determine the reliability of confidential information used in disciplinary proceedings by finding that:

It is implicit in the decision that the informants were deemed reliable and since the prisoner is not entitled to a statement of reasons for finding the information credible, a determination that he must be provided a statement that the information was considered to be reliable would be pointless.

*Id.* at 1098. Likewise, in the instant case, the disciplinary committee's statements in the decisions of January 18, 1978, and April 17, 1980, that confidential information was relied upon imply that such information was considered credible. Accordingly, the Court holds that there was no due process violation in the disciplinary committee's failures to explicitly determine the credibili-

ty of the confidential information relied upon in finding the plaintiff guilty of misconduct on the four occasions.

## II. Plaintiff's Administrative (Nonpunitive) Segregation.

From April 30, 1981, through November 4, 1983, the plaintiff was confined in administrative segregation pursuant to the terms of Wis.Admin.Code § HSS 308.01, *et seq.* During this interval, the PRC reviewed plaintiff's confinement approximately every three months. The plaintiff claims that the initial determination to place him in administrative segregation and the subsequent periodic reviews resulting in his continued confinement in administrative segregation violated his due process rights. Specifically, plaintiff contends that the PRC failed to follow applicable regulations in determining, both initially and at each subsequent periodic review, that he was "dangerous." Plaintiff also asserts a constitutional deprivation flowing from the PRC's allegedly inadequate factfinding process employed in deciding to subject him to administrative segregation. Essentially, plaintiff's position is that the PRC's determinations were unconstitutional since they relied, *inter alia,* on the disciplinary committee's four allegedly unconstitutional findings that plaintiff violated prison rules.

 The Court initially determines that the PRC's decision to confine plaintiff in administrative segregation and its subsequent review decisions continuing this confinement were constitutional despite the unconstitutionality of the disciplinary committee's September 27, 1977 decision finding plaintiff guilty of prison misconduct. In *Hewitt v. Helms,* 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1982), the United States Supreme Court discussed whether imposing administrative segregation involves the affected inmate's liberty interest protected by the Due Process Clause. The Supreme Court stated:

It is plain that the transfer of an inmate to less amenable and more restrictive quarters for nonpunitive reasons is well within the terms of confinement ordinarily contemplated by a prison sentence. The phrase "administrative segregation," as used by the state authorities here, appears to be something of a catchall: it may be used to protect the prisoner's safety, to protect other inmates from a particular prisoner, to break up potentially disruptive groups of inmates, or simply to await later classification or transfer. [citations omitted]. Accordingly, administrative segregation is the sort of confinement that inmates should reasonably anticipate receiving at some point in their incarceration. This conclusion finds ample support in our decisions regarding parole and good-time credits. Both these subjects involve release from institutional life altogether, which is a far more significant change in a prisoner's freedoms than that at issue here, yet in *Greenholtz* [v. Inmates of Nebraska Penal & Cor. 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979)] and *Wolff* we held that neither situation involved an interest independently protected by the Due Process Clause. These decisions compel an identical result here.

*Id.* at 468, 103 S.Ct. at 869–70. Accordingly, the Court finds in the present case that the plaintiff's confinement in administrative segregation, in and of itself, does not affect his liberty interests protected by the Due Process Clause. However, *Hewitt* went on to hold that a state may create a liberty interest protected by the Due Process Clause by enacting regulations of an explicitly mandatory nature outlining the procedures employed in imposing administrative segregation. *Id.* at 469–72, 103 S.Ct. at 870–71. Wisconsin has enacted such regulations.

Section HSS 308.04 of the Wisconsin Administrative Code governed the PRC's decision to subject plaintiff to administrative confinement. This section reads as follows:

**HSS 308.04 Administrative confinement.**

(1) Administrative confinement is an involuntary nonpunitive status for the segregated confinement of an inmate solely because he or she is dangerous, to

ensure personal safety and security within the institution. Inmate misconduct shall be handled through the disciplinary procedures.

(2) An inmate is dangerous if he or she evidences a substantial probability of physical harm to other persons as manifested by:

(a) Recent homicidal or other violent behavior; or

(b) The reasonable fear held by others of violent behavior and serious physical harm, because of a recent overt act or attempt or threat to do such physical harm.

Plaintiff claims that the PRC failed to follow HSS 308.04 in determining that he was "dangerous." Specifically, plaintiff claims that the PRC did not establish or document the recent occurrence of any of the events listed in HSS 308.04(2)(a) or (b) when it first placed plaintiff in administrative segregation and at the subsequent periodic reviews continuing his segregation.

 The following statements from the Supreme Court's decision in *Hewitt, supra,* shed light on whether the PRC's determinations met constitutional muster:

These considerations convince us that petitioners were obligated to engage only in an informal, nonadversary review of the information supporting respondent's administrative confinement, including whatever statement respondent wished to submit, within a reasonable time after confining him to administrative segregation.

Under *Mathews v. Eldridge,* 424 U.S. 319, 335 [96 S.Ct. 893, 903, 47 L.Ed.2d 18] (1976), we consider the private interests at stake in a governmental decision, the governmental interests involved, and the value of procedural requirements in determining what process is due under the Fourteenth Amendment. Respondent's private interest is not one of great consequence. He was merely transferred from one extremely restricted environment to an even more confined situation. Unlike disciplinary confinement the stigma of wrongdoing or misconduct does not attach to administrative segregation under Pennsylvania's prison regulations. Finally, there is no indication that administrative segregation will have any significant effect on parole opportunities.

459 U.S. at 472–73, 103 S.Ct. at 871–72. As we said in *Rhodes v. Chapman,* 452 U.S. 337, 349, n. 14 [101 S.Ct. 2392, 2400, n. 14, 69 L.Ed.2d 59] (1981), "a prison's internal security is peculiarly a matter normally left to the discretion of prison administrators." In assessing the seriousness of a threat to institutional security, prison administrators necessarily draw on more than the specific facts surrounding a particular incident; instead, they must consider the character of the inmates confined in the institution, recent and longstanding relations between prisoners and guards, prisoners *inter se,* and the like. In the volatile atmosphere of a prison, an inmate easily may constitute an unacceptable threat to the safety of other prisoners and guards even if he himself has committed no misconduct; rumor, reputation, and even more imponderable factors may suffice to spark potentially disastrous incidents. The judgment of prison officials in this context, like that of those making parole decisions, turns largely on "purely subjective evaluations and on predictions of future behavior," *Connecticut Board of Pardons v. Dumschat,* 452 U.S. 458, 464 [101 S.Ct. 2460, 2464, 69 L.Ed.2d 158] (1981); indeed, the administrators must predict not just one inmate's future actions, as in parole, but those of an entire institution. Owing to the central role of these types of intuitive judgments, a decision that an inmate or group of inmates represents a threat to the institution's security would not be appreciably fostered by the trial-type procedural safeguards suggested by respondent. This, and the balance of public and private interests, lead us to conclude that the Due Process Clause requires only an informal nonadversary review of evidence, discussed more fully below, in order to confine an inmate feared to be a threat

to institutional security to administrative segregation.

*Id.* at 474, 103 S.Ct. at 873.

An inmate must merely receive some notice of the charges against him and an opportunity to present his views to the prison official charged with deciding whether to transfer him to administrative segregation. Ordinarily a written statement by the inmate will accomplish this purpose, although prison administrators may find it more useful to permit oral presentations in cases where they believe a written statement would be ineffective. So long as this occurs, and the decisionmaker reviews the charges and then-available evidence against the prisoner, the Due Process Clause is satisfied.

*Id.* at 476, 103 S.Ct. at 874.

Of course, administrative segregation may not be used as a pretext for indefinite confinement of an inmate. Prison officials must engage in some sort of periodic review of the confinement of such inmates. This review will not necessarily require that prison officials permit the submission of any additional evidence or statements. The decision whether a prisoner remains a security risk will be based on facts relating to a particular prisoner—which will have been ascertained when determining to confine the inmate to administrative segregation—and on the officials' general knowledge of prison conditions and tensions, which are singularly unsuited for "proof" in any highly structured manner. Likewise, the decision to continue confinement of an inmate pending investigation of misconduct charges depends upon circumstances that prison officials will be well aware of—most typically, the progress of the investigation. In both situations, the ongoing task of operating the institution will require the prison officials to consider a wide range of administrative considerations....

*Id.* at 477 n. 9, 103 S.Ct. 874 n. 9.

In the present matter, the plaintiff along with his staff advocate and social worker were afforded the opportunity to make statements to the PRC at the hearings held to determine whether to confine plaintiff in administrative segregation and at the subsequent PRC reviews of plaintiff's confinement. The PRC based its decisions to initially place, and to subsequently continue, plaintiff in administrative segregation, *inter alia,* on these statements, on the plaintiff's Social Services file containing all conduct reports filed against him, the disciplinary committee reports and staff recommendations. This procedure certainly comported with the due process mandates outlined in *Hewitt.* Accordingly, the Court finds that the plaintiff was not constitutionally deprived by the PRC's determination to confine him in administrative segregation and the review decisions continuing his confinement.

## REMEDY

As stated above, the only constitutional wrongdoing in this case is the disciplinary committee's insufficient statement of evidence relied upon in its September 27, 1977 decision finding plaintiff guilty of misconduct and confining him to punitive segregation. Of the named defendants, only the then warden of Waupun, Thomas Israel, could be held responsible for this deprivation. None of the other named defendants are alleged to have had any involvement with the September 27, 1977 decision. Accordingly, these defendants are hereby dismissed from this action.

Regarding the remaining defendant, Warden Israel, the Court notes that its finding of a constitutional deficiency in the September 27, 1977 statement of evidence relied upon, was based on the Seventh Circuit's decision in *Redding v. Fairman,* 717 F.2d 1105 (7th Cir.1983). This case was decided more than six years after plaintiff's constitutional deprivation. In *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982), the Supreme Court held that "government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or

constitutional rights of which a reasonable person would have known." *Redding* established the constitutional requirement concerning the content of the statement of evidence relied upon by a prison disciplinary committee in finding a prisoner guilty of misconduct. Accordingly, under *Harlow*, defendant Israel cannot be held liable for the constitutional deprivation resulting from a violation of the requirements ennunciated in *Redding*.

Plaintiff also requests that the Court exercise its equitable powers and expunge from his records the results of those disciplinary proceedings whereat his due process rights were violated.

The Court must balance the parties' interests at stake in deciding whether to expunge a violation from a person's administrative record. *Redding v. Fairman*, 717 F.2d 1105, 1119 (7th Cir. 1983). The prison authorities have interests in maintaining accurate records and insuring prison security; the prisoner has an interest in avoiding subsequent adverse consequences flowing from his records. *Id.* However, where the evidence establishes that the prisoner was guilty of the wrongdoing even though he was denied his procedural due process rights in the determination of this guilt, the prisoner is entitled only to monetary damages and not to equitable relief. *Smith v. DeBartoli*, 769 F.2d 451, 452–53 (7th Cir.1985).

In the present case the defendants have proffered various evidence establishing the plaintiff's misconduct found by the disciplinary committee on September 27, 1977. Specifically, the defendants submit various confidential letters from Waupun inmates complaining of the plaintiff's sexual solicitations and threats and the plaintiff's conduct report of September 10, 1977. The Court may appropriately review these items in assessing whether the disciplinary committee's decision was justified. *See Dawson v. Smith*, 719 F.2d 896 (7th Cir.1983); *Hudson v. Cady*, 610 F.Supp. 1096 (E.D.Wis.1985). The Court finds that the evidence proffered by the defendants supports the disciplinary committee's September 27, 1977 findings and, accordingly, the Court hereby DENIES plaintiff's request for expunction.

### SUMMARY

The only constitutional deprivation suffered by the plaintiff was the disciplinary committee's deficient statement of the evidence relied upon in its September 27, 1977 decision finding plaintiff guilty of misconduct. The Court finds that the only defendant who could be at fault for this deprivation was shielded from liability by the cloak of qualified immunity. Finally, the Court denies plaintiff's request for equitable relief since the evidence presented to the Court supports the disciplinary committee's decision.